,UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MARIANO J. REIS,

      Plaintiff,

vs.                                    CASE NO. 8:12-CV-2452-T-17EAJ

ALLSTATE INSURANCE COMPANY,

      Defendant.

_____/

## ORDER

This cause is before the Court on Defendant, Allstate Insurance Company's, Motion for

Summary Judgment (Doc. 56), Plaintiff, Mariano J. Reis's, Memorandum of Law in Opposition

to Defendant's Motion for Summary Judgment (Doc. 66), and Defendant's Reply in Support of

Its Motion for Summary Judgment (Doc. 71). For the reasons set forth below, Defendants'

Motion for Summary Judgment will be **GRANTED**.

## PROCEDURAL HISTORY

On November 14, 2011, Plaintiff filed a charge of discrimination and retaliation with the

United States Equal Employment Opportunity Commission (EEOC). (Doc. 65-27). In Plaintiff's

first EEOC charge, he alleges that Defendant discriminated against him because of his "national

origin, Hispanic," and for "complaining that Allstate was making employment decisions based

on race, sex, national origin and age." *Id.* On September 7, 2012, Plaintiff filed a second charge

with the EEOC alleging that Defendant had "retaliated against him for filing the first charge

because it had allegedly offered everyone but him a job" when Defendant purchased the eAgent

software from Plaintiff's subsequent employer, eBridge, Inc. (Doc. 58 at ¶ 9). The EEOC issued

Notices of Right to Sue with respect to both charges on September 27, 2012. *Id.* On October 29, 2012, Plaintiff filed a Complaint with this Court. (Doc. 1). Plaintiff filed an Amended Complaint on February 28, 2013, alleging two counts of employment discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (Doc. 17).

Count I of Plaintiff's Amended Complaint alleges that Defendant unlawfully discriminated against Plaintiff when it terminated him because "Plaintiff's national origin, Hispanic, was a determining factor in Defendant's decision to terminate Plaintiff's employment." (Doc. 17 at ¶ 10). Count II alleges that Defendant unlawfully retaliated against Plaintiff on two occasions. First, Plaintiff claims that Defendant terminated his employment to retaliate against him "for having complained about Defendant's discriminatory employment practices" *Id.* at ¶ 17. Second, Plaintiff claims that Defendant retaliated against him by "interfering with the Plaintiff's employment with eBridge" and by failing to "offer Plaintiff employment when it purchased the rights to the agency management software from eBridge." *Id.* at ¶ 16. Plaintiff claims that Defendant's actions during Plaintiff's tenure at eBridge were "intended to retaliate against the Plaintiff for having complained about Defendant's discriminatory employment practices . . . and to punish the Plaintiff for having filed charges of discrimination and retaliation with the Equal Employment Opportunity Commission . . . ." *Id.* Defendant filed an Answer to Plaintiff's Amended Complaint on March 3, 2013, denying all allegations of wrongdoing. (Doc. 18).

On April 30, 2014, Defendant filed a Motion for Summary Judgment. (Doc. 56). On May 28, 2014, Plaintiff filed a Memorandum in Opposition to Defendant's Motion for Summary Judgment. (Doc. 66). Finally, on June 6, 2014, Defendant filed a Reply in Support of Its Motion for Summary Judgment. (Doc. 71).

2

## FACTUAL BACKGROUND

The following facts, taken from the pleadings and exhibits, are assumed as true solely for the purpose of resolving the pending motion. Plaintiff was born in Argentina in 1961 and came to the United States in 1975. (Doc. 59-3 at 12:21-22, 14:19-25). In 1986, Plaintiff applied for employment with Defendant. (*Id.* at 15:1-23, 18:16-20, 19:11-18). Plaintiff's application for employment with Defendant did not require him to disclose either his race or his national origin. However, on his application, Plaintiff did disclose that he was not a citizen of the United States and that he was employed in Argentina for two years. (*Id.* at 21:15-21; Doc. 61-1). Plaintiff also reported his ethnicity for affirmative action reporting, which was used by Defendant for succession planning purposes. (Doc. 68-1 at ¶ 1). Plaintiff self-identifies as Hispanic. (Doc. 61-1 at 20:21-25; Doc. 59-12 at 371:9-20). Plaintiff also frequently spoke Spanish at work and commonly referred to the fact that he was born in Argentina. (Doc. 68-1 at ¶ 1).

## I.     PLAINTIFF'S EARLY EMPLOYMENT HISTORY WITH ALLSTATE

Plaintiff began working for Defendant in 1986 as a supervisor. Throughout his career, Plaintiff received multiple promotions to unit manager, division manager, human resource (HR) consultant, senior manager, and agency support manager positions. (Doc. 59-3 at 22:10-23:12). Plaintiff ultimately became the Strategic Deployment Leader ("SDL") for Allstate's Florida Market Operating Committee (the "MOC") in January of 2010, a position he held until his termination in 2011. (*Id.* at 67:1-22). In that position, Plaintiff reported to Bob Jackson ("Jackson"), the Regional Sales Leader, who reported to the Field Senior Vice president, Mike Sheely ("Sheely"). (*Id.* at 62:1-9). Valerie Grodman ("Grodman"), who also reported to Jackson, was the Sales Support Leader, whereas Sheldon Reiss (no relation to Plaintiff) was a Field Sales Leader ("FSL"). (*Id.* at 62:16-18, 98:22-99:1). Olga Otero ("Otero") was the Florida MOC's

3

Human Resource Business Partner. (Doc. 60-46 at 7:3-13). She reported to Bill Ayo ("Ayo"), the Human Resources Manager until his retirement on December 31, 2011. (*Id.* at 7:16-21, 56:23-25).

As SDL, Plaintiff oversaw a team of employees that had responsibilities related to the appointment of new agents. (Doc. 61-1 at 67:16-68:6). These responsibilities included assembling an "appointment file" for each potential new agent. The appointment file contained documentation of the candidates' eligibility, qualifications, and experience. To be approved, the appointment file required Plaintiff's signature, as well as the signatures of the Field Vice President, the HR Manager, the Controller, and the Regional Sales Leader. (*Id.* at 71-73; Doc. 60-45 at 21-25; Doc. 60-46 at 22). Plaintiff's team was also responsible for ordering marketing materials for the new agents and setting up the new agents' websites. (Doc. 61-1 at 72:24-73:22).

During Plaintiff's employment with Defendant, the only disciplinary action taken against Plaintiff (prior to his termination in 2011) was a "Job in Jeopardy Notification" that he received in July of 2002. (Doc. 59-5 at ¶ 5). Defendant issued Plaintiff's Job in Jeopardy Notification at the conclusion of an investigation conducted by Defendant's Corporate Security Department. The investigation was focused on Plaintiff's efforts to help his brother obtain an H1B visa for an open position with Defendant. The investigation found that Plaintiff had supplied "inaccurate information in an effort to bolster the likelihood that [his] brother would receive the visa." *Id.* When Plaintiff was issued the Job in Jeopardy Notification, Phil Lawson—a senior officer for Defendant—told Plaintiff that the purpose of the Job in Jeopardy Notification was to ensure that Plaintiff did not file for any visas in the future. According to Plaintiff's deposition, Lawson also told him that the only way the notice would affect him or his future employment was if he was found to have engaged in inappropriate activity related to visas. (Doc. 68-1 at ¶ 5). However, on

4

its face, the Job in Jeopardy Notification was indefinite and stated that Plaintiff is "expected to

abide by as well as enforce Defendant's policies and procedures" and "[a]ny future violations

will result in the termination of [Plaintiff's] employment with Allstate." (Doc. 59-5 at 1).

Furthermore, there were no notations in Plaintiff's personnel file limiting the applicability of

Plaintiff's Job in Jeopardy Notification to situations involving visas. (Doc. 65-1 at ¶ 8).

## II.   DEFENDANT'S "MARKET MAX" STRATEGY

Beginning in 2009, Defendant implemented the "Market Max" Strategy, which it

employed to accelerate the termination of agencies that were considered unprofitable. (Doc. 61-1

at 68, 86-87). At the time, the region had "huge profitability issues" and Defendant decided to

reduce the number of agencies in the region by 65 so that better performing agencies could bring

themselves up to scale. (*Id.* at 69:4-21, 89:7-19). The Market Max Strategy was administered by

the HR department, but Plaintiff was asked to create a report to track the goal of terminating 65

agencies. (Doc. 68-1 at ¶ 32). In accordance with the Market Max Strategy, the agencies in the

region were divided into six segments, with the 65 terminations to come from the two segments

encompassing the lowest performing agencies. (Doc. 61-1 at 85:22-86:7). Based upon Plaintiff's

own analysis of the agents selected for termination, he determined that approximately 75% of the

agents were either Black, Hispanic, female, or older workers. (*Id.* at 80-83). Plaintiff did not look

at the overall racial, gender, or age demographics of agencies in the Florida region (*Id.* at 325:16-

326:1).

In May of 2011, Plaintiff began complaining to Olga Otero, Bob Jackson, and Bill Ayo

that the agency terminations were disproportionately affecting agents in protected classes. (*Id.* at

82:10-83:9). However, Plaintiff did not complain to anyone outside the region, and he does not

know whether the people he did complain to shared his complaints with anyone else. (*Id.* at

101:13-102:14, 103:10-13; Doc. 59-12 at 330:7-21). During their depositions, Jackson and Otero denied that Plaintiff had ever complained about agency terminations having a disparate impact on agents in protected classes. (Doc. 60-45 at 37:25-38:14; Doc. 60-46 at 51:7-16).

### III.   2011 INVESTIGATION AND PLAINTIFF'S TERMINATION

On May 3, 2011, Defendant received a letter from an attorney who was representing Sheldon Reiss, then a Field Sales Leader ("FSL") in the Florida MOC. (Doc. 65-2). Among other things, that letter alleged that the Florida MOC had been allowing agencies to open without having the required licenses in violation of Florida state law and Allstate policy. *Id.* Specifically, the letter alleged that "illegal and unethical tactics" were used to pressure "agents who had not yet obtained their licenses to open an agency anyway subject to a 'letter of understanding.'" *Id.* The letter details numerous instances of illegal or unethical conduct and specifically alleges that Reiss objected to these practices and voiced his concerns to Plaintiff, who was his direct supervisor. Plaintiff allegedly responded to Reiss's objections by telling him: "Trust me, you do not want to be the reason for the Region not making the appointment plan." *Id.*

Shortly after receiving the letter from Reiss's attorney, Defendant received a similar letter from an attorney representing Valerie Grodman, then Sales Support Leader for the Florida MOC. (Doc. 65-3). This letter discussed similar allegations of misconduct and mentioned that Grodman "objected to Allstate's unlawful hiring of unlicensed insurance agents in violation of Florida Statutes." *Id.* According to this letter, in response to Grodman's objections, "senior management took the position that the situation was not as 'black and white' as she represented." *Id.* In a later interview, Grodman attributed this quote to Plaintiff. (Doc. 65-13 at 24:16-19). Plaintiff acknowledges that Grodman raised concerns about unlicensed agents during a meeting with Plaintiff, Olga Otero, and Bill Ayo. (Doc. 65-12 at 50:5-24).

6

After receiving the letter from attorneys representing Reiss and Grodman, Allstate's Corporate Security Department consulted with Defendant's in-house counsel. (Doc. 65-1 at ¶ 5). At the direction of one of Allstate's attorneys, Corporate Security commenced an investigation into the letters' allegations shortly after Allstate received them. *Id.* Kendra Mills was in charge of the investigation; the investigation lasted for approximately three months. (*Id.* at ¶¶ 5-6). During her investigation, Mills reviewed numerous documents and interviewed over a dozen employees, including Plaintiff himself on two separate occasions. (Doc. 65-4). She also gathered information from other Allstate employees not directly involved in the appointment of unlicensed agents. *Id.*

Mills completed her investigation and summarized the evidence in a report dated August 10, 2011. (Doc. 65-1 at ¶ 7). The report identified all of the individuals who were involved in the appointment of unlicensed agents. (Doc. 65-4). In his declaration, Steve Scholl—the Vice President of Human Resources at the time of the investigation and the individual who submitted the formal request for Plaintiff's termination—stated that "[t]he investigation revealed that Plaintiff had played a pivotal role in the appointment of unlicensed agents. Moreover, he already had an outstanding [Job in Jeopardy Notification] at the time." (Doc. 65-10 at ¶ 6). Scholl further stated that, "[i]n light of this, the decision was made to terminate Plaintiff's employment shortly after Corporate Security had issued its findings." *Id.* Plaintiff maintains that he was not a "driving force" behind the appointment of unlicensed agents. (Doc. 67 at ¶ 41).

The Corporate Security investigation also revealed that several other individuals bore responsibility for the appointment of the unlicensed agents; however, Plaintiff was the only person involved who had ever received a Job in Jeopardy Notification. (Doc. 65-10 at ¶ 7). The decision to terminate Plaintiff was made shortly after the investigation ended; this decision was based on the alleged "pivotal role" that Plaintiff played in the appointment of unlicensed agents

and the fact that he was the only individual involved who had an outstanding Job in Jeopardy

Notification. *Id.* However, "no formal Termination Request was completed right away because

decisions were still being made about the nature and extent of others' involvement and the

appropriate discipline for them." *Id.* Although Plaintiff was the only employee terminated in

connection with the appointment of unlicensed agents, he was not the only person disciplined.

Bob Jackson, Nick Castellano, and Richard Cairns received indefinite "Unacceptable

Notifications," and Olga Otero received a verbal reprimand for failing to "follow through on the

agents that were being appointed in the state of Florida without a license." (Doc. 65-18 at 30-33;

Doc. 65-19 at 63:14-17).

On Friday, September 2, 2011, Olga Otero informed Plaintiff that he needed to report to a

hotel for a meeting with Steve Scholl on the following Friday, September 9, 2011. This hotel

meeting is where Plaintiff was ultimately terminated. (Doc. 59-12 at 295-296, 317-319). In his

deposition, Plaintiff admits that—after Otero informed him of this meeting—Plaintiff suspected

that he was going to be terminated. (*Id.* at 295-296). Specifically, Plaintiff stated that he could

"see the handwriting on the wall." (*Id.* at 295:18-19). Plaintiff also stated that, after speaking

with Otero, "it didn't take a rocket scientist to figure out what was about to happen." (*Id.* at

295:22-24).

On September 8, 2011, Plaintiff's approached Mike Sheely and asked if he was going to

be terminated; Sheely confirmed Plaintiff's suspicions. (*Id.* at 305-306). Also on September 8,

2011, Steve Scholl submitted a formal Termination Request for Plaintiff. (Doc. 65-21). On that

same day, the Termination Request was signed by Kelly Noll (Senior Vice President of Human

Resources) and Christi Rushing from Workforce Relations. (Doc. 65-10 at ¶ 9; Doc. 65-21).

Also on September 8, 2011, a representative from Defendant's legal department and a

8

representative from Workforce Relations signed off on a Jury Sheet for Plaintiff's Termination. (Doc. 65-21).

From his home on the evening of September 8, 2011, Plaintiff submitted an electronic i-Report to Defendant. (Doc. 59-12 at 305:13-15, 309:5-12). The i-Report process is an established mechanism for employees to raise ethical concerns and submit workplace complaints. In his i-Report, Plaintiff stated that "[t]o date, we have lost 102 agencies. 75% of the YTD terminations are from protected minorities (50% are hispanic.) Targeting the termination of specific employees and/or independent contractors is a violation of federal law . . . ." (Doc. 61-4).

The i-Report system is a closed system, meaning that access to i-Reports is limited to authorized individuals in Workforce Relations. (Doc. 60-20 at ¶ 9). Reports are treated as confidential as possible. *Id.* Reports submitted via the website outside normal business hours are only opened by Workforce Relations after business resumes on the following day. *Id.* Here, Plaintiff's i-Report was assigned to Christi Rushing in Workforce Relations at 8:29 a.m. on the morning of September 9, 2011. *Id.* at ¶ 10. While Rushing may have discussed Plaintiff's i-Report with one of Allstate's in-house attorney's at the time, she did not discuss it with either Cathy Brune or Ben Tarver. *Id.* On September 9, 2011, Brune and Tarver were the last two people to sign off on the Jury Sheet for Plaintiff's termination. (Doc. 65-21).

On September 9, 2011, Plaintiff was advised of his termination at the pre-arranged hotel meeting. (Doc. 59-12 at 295:9-13). According to Plaintiff's deposition, Plaintiff told Steve Scholl that he had filed an i-Report one day earlier. Furthermore Plaintiff told Scholl, "I did nothing wrong . . . If you think what I did is unethical, how about putting a bounty on terminating agents? How about the fact that 75 percent of the people that are leaving are from a protected class?" (*Id.* at 319:2-7). Plaintiff does not allege that any specific individuals at Allstate were

9

aware of his national origin. Furthermore, the pleadings and exhibits contain no evidence indicating that any of the individuals responsible for the 2011 Corporate Security Investigation and the subsequent decision to terminate Plaintiff's employment had any knowledge of Plaintiff's national origin during the times relevant to this case. (Doc. 60-1 at ¶ 13; Doc. 60-11 at ¶¶ 3-7; Doc. 60-47 at ¶¶ 4-6).

## IV.   PLAINTIFF'S SUBSEQUENT EMPLOYMENT AT eBRIDGE

Slightly more than a month after Defendant terminated Plaintiff's employment, Plaintiff received an offer to work as a Sales Vice President for another company, eBridge, Inc. (Doc. 61-5). In that position, he had responsibilities for the sales of eBridge's agency management software, eAgent, to Defendant's agents and others. (Doc. 59-12 at 335:6-15, 376:1-13). Plaintiff had two salespeople reporting to him, John Mayeux and Steve Mohr. (Doc. 60-49 at ¶ 4).

After Plaintiff's employment with Defendant was terminated, Iris Chester took over Steve Scholl's responsibilities as Vice President of Human Resources for Allstate. At the time, Scholl told Chester that a Corporate Security investigation had recently taken place and that "the person that was not behaving properly" had left the organization. (Doc. 60-50 at 10:1-15). Scholl did not tell Chester that Plaintiff "had made any complaint of discrimination or filed a charge with the U.S. Equal Employment Opportunity Commission." (Doc. 60-51 at ¶ 4). Chester "did not learn of any such complaint or charge from any source at any time prior to being asked to give a deposition in this case on February 12, 2014." *Id.*

At some point, Chester learned that Plaintiff was interacting with Allstate agents and representatives in his new position. (Doc. 60-50 at 26:22-27:4). Reasoning that Allstate would not want Plaintiff interfacing with agents if it did not want him in a role as a corporate leader, Chester consulted with in-house counsel and then reached out to Allstate's Sourcing and

Procurement Solutions Department to ask that plaintiff be removed from eBridge's Allstate account. (*Id.* at 27:24-28:11). Thereafter, in January of 2012, Kurtiss Bialoruski of that department reached out to eBridge and asked that Plaintiff not be allowed to interface with Allstate representatives any longer. (Doc. 60-52 at 7:2-8:7).

In September of 2012, Defendant purchased the eAgent asset from eBridge. At the time, Allstate did not have an interest in hiring Plaintiff or his sales team because it already had sufficient support for distribution of the product to Allstate's agents. (Doc. 60-49 at ¶¶ 5-7). To assist with the transition, however, Darren Robbins—the person responsible for determining whom to hire—retained John Mayeux and Steve Mohr as independent contractors. (*Id.* at ¶¶ 6-7). Robbins "was not aware of the circumstances surrounding Plaintiff's departure from Allstate" and was not aware "that he had complained about any of Allstate's employment practices or filed a charge with the Equal Employment Opportunity Commission." (*Id.* at ¶ 5). Robbins was "also not aware that another employee in Allstate's Sourcing and Procurement Department had previously been tasked with asking . . . that Plaintiff be removed from eBridge's Allstate account earlier in 2012." *Id.*

Robbins decided not to retain Plaintiff as an independent contractor based on the following: (1) Allstate did not need someone at Plaintiff's level because Robbins could fill that role; (2) the other two salespeople had sufficient experience to help with the transition; (3) Robbins believed that Allstate could retain Mayeux and Mohr for less than what Plaintiff would require, which was particularly important because Allstate did not need someone at Plaintiff's level; and (4) Robbins was under the impression that Plaintiff was a valued employee that eBridge would want to retain going forward. (Doc. 60-49 at ¶ 7).

11

## STANDARD OF REVIEW

Summary judgment is proper if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is any fact that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute exists where the record, taken as a whole, contains evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). Once the moving party has met its burden of showing the non-existence of a genuine issue of material fact, the non-moving party must go beyond the pleadings to show that a genuine issue indeed exists for trial. *Id.* at 324.

When determining whether summary judgment is appropriate, the court does not weigh the evidence or make findings of fact. *Anderson*, 477 U.S. at 249-50. The weighing of evidence and determinations of credibility are functions of the jury, not the judge. *Id.* at 255. Therefore, if determination of the case rests on deciding which competing version of the facts and events is true, then summary judgment is inappropriate and the case should be submitted to the jury. *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1531 (11th Cir.1987). In determining whether summary judgment is appropriate, the court must consider all evidence in the light most favorable to the nonmoving party. *Sweat v. Miller Brewing Co.*, 708 F.2d 655, 656 (11th Cir. 1983); *see Hickson Corp. v. Northern Crossarm Co., Inc.*, 907 F.3d 1256, 1260 (11th Cir. 2004).

12

However, "[i]f the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson*, 477 U.S. at 249-50.

## DISCUSSION

### I. DISCRIMINATION CLAIM

Defendant requests that this Court grant summary judgment as a matter of law in its favor on Count I of Plaintiff's Amended Complaint. Count I alleges that Defendant unlawfully discriminated against Plaintiff on the basis of Plaintiff's national origin when it terminated his employment. For the reasons set forth below, Defendant's Motion for Summary Judgment is hereby **GRANTED** with respect to Count I of Plaintiff's Amended Complaint.

Under 42 U.S.C. § 2000e-2(a)(1), it is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." Where there is no direct evidence of discrimination, a plaintiff typically makes a case of discrimination through indirect evidence using the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie* case of discrimination. Then, the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for its actions. Finally, the burden shifts back to the plaintiff to establish that the defendant's proffered reason is mere pretext for unlawful discrimination. *See McDonnell Douglas Corp.*, 411 U.S. 792 (1973).

First, Plaintiff must establish a *prima facie* case of discrimination by showing that: (1) he belonged to a protected class, (2) he was qualified to do the job, (3) he suffered an adverse employment action, and (4) the employer treated similarly situated employees outside of the

13

plaintiff's protected class more favorably. *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008); *see Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). The Eleventh Circuit "requires that the fourth prong be established with evidence of a comparator who is 'similarly situated in all relevant respects' to the plaintiff." *Aristyld v. City of Lauderhill*, 543 F. App'x 905, 907 (11th Cir. 2013) (*per curiam*). To establish the validity of a comparator, "the quantity and quality of a comparator's misconduct must be nearly identical to the plaintiff's misconduct." *Id.*; *see Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999).

Once a plaintiff has established a *prima facie* case of discrimination, the burden shifts to the employer "to articulate some legitimate, non-discriminatory reason" for the alleged discriminatory action. *See McDonnell Douglas*, 411 U.S.at 802; *see Perryman v. Johnson Products Co., Inc.*, 698 F.2d 1138, 1142 (11th Cir. 1983). "Because the Defendant need only produce, not prove, a non-discriminatory reason, this burden is 'exceedingly light.'" *Walker v. Nations Bank of Florida, N.A.*, 53 F.3d 1548, 1556 (11th Cir. 1995) (quoting *Perryman*, 698 F.2d at 1142). Once the defendant has met his burden of production, the plaintiff must prove by a preponderance of evidence that the employer had a discriminatory intent and that the reason given for the adverse employment decision was merely pretextual. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *see also Perryman*, 698 F.2d at 1142. If the plaintiff fails to set forth specific facts showing that a genuine issue exists as to whether the employer's reasons are pretextual, then summary judgment is appropriate. *See Young v. General Foods Corp.*, 840 F.2d 825, 828 (11th Cir. 1988).

### A. *Prima Facie* Case of Discrimination

Both parties concede that Plaintiff has satisfied elements one, two, and four of the *prima facie* case. Defendant argues that Plaintiff has failed to establish element three—that the

14

employer treated similarly situated employees outside of the plaintiff's protected class more favorably. Plaintiff points to several individuals who were involved in the appointment of unlicensed agents, who were not born in Argentina, and who received less severe punishments for their conduct. However, Plaintiff fails to establish that these individuals were similarly situated to Plaintiff in *all relevant respects.* After thoroughly reviewing the record of this case, the Court finds that Plaintiff was the only individual involved in the appointment of unlicensed agents who had an indefinite Job in Jeopardy Notification at the time. Plaintiff has failed to produce any evidence to show that any of the individuals he proffers as comparators had any disciplinary record prior to the Corporate Security Investigation.

### B. Pretext

Even assuming, *arguendo*, that Plaintiff was able to establish a *prima facie* case of discrimination on the basis of national origin, Defendant would still be entitled to judgment as a matter of law. Defendant has provided a legitimate, non-discriminatory reason for terminating Plaintiff. Defendant has met its "exceedingly light" burden of production by stating that it terminated Plaintiff because of his Job in Jeopardy Notification and because of his involvement in the appointment of unlicensed agents. This reason for termination is non-discriminatory on its face. Defendant having proffered a legitimate, non-discriminatory reason, the burden would shift back to Plaintiff to set forth specific facts showing that a genuine issue exists as to whether the employer's reasons are pretextual.

Plaintiff fails to provide any evidence that Defendant's proffered reasons for terminating Plaintiff were pretext for unlawful discrimination on the basis of national origin. Although Plaintiff frequently spoke Spanish at work and commonly referred to the fact that he was born in Argentina (Doc. 68-1 at ¶ 1), Plaintiff does not allege that any specific individuals at Allstate

15

were aware of his national origin. Furthermore, the pleadings and exhibits contain no evidence indicating that any of the individuals responsible for the 2011 Corporate Security Investigation and the subsequent the decision to terminate Plaintiff's employment had any knowledge of Plaintiff's national origin during the times relevant to this case. The only evidence on the record that speaks to the knowledge of those involved in the decision to terminate Plaintiff indicates that these individuals were not aware of the fact that Plaintiff was born in Argentina. (Doc. 60-1 at ¶ 13; Doc. 60-11 at ¶¶ 3-7; Doc. 60-47 at ¶¶ 4-6).

Because Plaintiff cannot establish a *prima facie* case of discrimination, and because Plaintiff cannot show that any of the individuals involved in making the decision to terminate his employment had any knowledge of his national origin, Plaintiff fails to establish a genuine issue of fact with respect to his claim that his termination was motivated by unlawful discrimination. Accordingly, Defendant is entitled to judgment as a matter of law on Count I of Plaintiff's Amended Complaint. Therefore, Defendant's Motion for Summary Judgment on Count I is hereby **GRANTED**.

## II. RETALIATION CLAIMS

Defendant further asks this Court to grant its Motion for Summary Judgment with respect to Count II of Plaintiff's Amended Complaint. Count II alleges that Defendant retaliated against Plaintiff for complaining to Bob Jackson and Olga Otero about the disparate impact of the Market Max Strategy on protected groups, for filing the i-Report, and for filing subsequent charges with the EEOC. For the reasons set forth below, Defendant's Motion for Summary Judgment is hereby **GRANTED** with respect to Count II.

Under Title VII, an employer cannot retaliate against an employee who has opposed an unlawful employment practice, made a charge, or participated in any way in an investigation of

the unlawful employment activity. *See* 42 U.S.C. § 2000e-3(a); *see Saffold v. Special Counsel, Inc.*, 147 F. App'x 949, 950 (11th Cir. 2005). Just as with discrimination claims, where there is no direct evidence of retaliation, a plaintiff can use circumstantial evidence to establish a case of retaliation under the *McDonnell Douglas* framework.

First, Plaintiff must establish a *prima facie* case of retaliation by showing that: (1) he participated in a protected activity, (2) he suffered an adverse employment action, and (3) there was a causal connection between the participation in the protected activity and the adverse employment action. *Gupta v. Fla. Bd. Of Regents*, 212 F.3d 571, 587 (11th Cir. 2000); *see Goldsmith v. City of Atmore*, 996 F.2d 1155 (11th Cir. 1993). Then, the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for its actions. Finally, the burden shifts back to the plaintiff to establish that the defendant's proffered reason is mere pretext for unlawful retaliation. *See McDonnell Douglas*, 411 U.S.at 802. In the present case, the parties agree that Plaintiff has suffered an adverse employment action. Only elements one and three of the *prima facie* case are contested by the parties in their memorandums in support of and in opposition to Defendant's Motion for Summary Judgment.

### A. Statutorily Protected Activities

This Court finds that Plaintiff established a genuine issue of material fact as to whether he engaged in statutorily protected activities when he filed his i-Report and his charges with the EEOC. Both the i-Report system and EEOC complaints are formal mechanisms for reporting instances of discrimination. As such, both activities are protected so long as Plaintiff has a "reasonable good faith belief" in his complaint when he filed it. *See Holifield*, 115 F.3d at 1156. Although Defendant contends that Plaintiff could not have had a good faith belief that his complaints were valid, the record contains enough evidence to establish a genuine issue of

material fact on this issue. An internal complaint opposing discrimination filed with a superior is also statutorily protected. *Gerard v. Bd. Of Regents of State of Ga.*, 324 F. App'x 818, 825 (11th Cir. 2009); *see Birdyshaw v. Dillard's, Inc.*, 308 F. App'x 431, 437 (11th Cir. 2009). Therefore, this Court finds that Plaintiff has sufficiently established a genuine dispute of fact regarding whether he engaged in a statutorily protected activity when he voiced concerns about the Market Max Strategy to Jackson and Otero.

### B. Causation

However, Plaintiff's retaliation claim fails because he cannot establish the causation element of the *prima facie* case. To create a genuine issue of causation, Plaintiff must show that the "decision-maker[s] [were] aware of the protected conduct," and "that the protected activity and the adverse action were not wholly unrelated." *Gupta*, 212 F.3d at 578; *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000); *see Goldsmith*, 966 F.2d at 1162. Circumstantial evidence can be used to establish the knowledge of the decision maker. *Id.* Plaintiff must show that the individuals who actually made the decision to terminate him and those who decided not to hire him when Defendant purchased eAgent from eBridge were aware of Plaintiff's involvement in the protected activity. *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997). This is logical because a decision maker cannot be motivated to retaliate against an activity that is unknown to him. *Brungart*, 231F.3d at 799. Plaintiff's retaliation claim fails because he cannot establish that—because he engaged in protected activities—Defendant retaliated against him (1) when it terminated his employment and (2) when it failed to offer him employment when it purchased the eAgent asset from Plaintiff's subsequent employer.

18

First, Plaintiff cannot show that Defendant retaliated against him when it terminated his employment because he cannot establish causation. Plaintiff cannot satisfy the causation element of the *prima facie* case because—although his complaints to Bob Jackson and Olga Otero were statutorily protected—the record does not contain any evidence to suggest that the individuals who decided to terminate Plaintiff's employment had any knowledge of these complaints. The evidence in this case indicates that Kendra Mills conducted the investigation that led to Plaintiff's termination (Doc. 65-1 at ¶¶ 5-6); Steve Scholl submitted the formal request to terminate Plaintiff (Doc. 65-21); Kelly Noll and Christi Rushing signed off on Scholl's termination request form (*Id.*); and Ben Tarver, Cathy Brune, Christi Rushing, and Susan L. Rosborough signed the Jury Sheet for Plaintiff's termination (*Id.*). Plaintiff has not specifically alleged that any of these individuals had any knowledge of the complaints that he made to Jackson and Otero. Furthermore, in his deposition, Plaintiff admits that he did not complain to anyone outside of his region and that he does not know whether Jackson or Otero shared his complaints with anyone else. (Doc. 61-1 at 101:13-102:14, 103:10-13; Doc. 59-12 at 330:7-21). Because Plaintiff cannot show that any of the relevant decision makers had any knowledge of his complaints to Jackson and Otero, Plaintiff cannot establish that he was terminated *because* of those complaints.

Similarly, Plaintiff cannot establish a causal relation between his i-Report and the decision to terminate his employment. The evidence in this case shows that the decision to terminate Plaintiff was made before he filed his i-Report. On September 8, 2011—during normal business hours—Steve Scholl submitted a formal request for Plaintiff's termination. (Doc. 65-21). On that same day—also during normal business hours—Kelly Noll and Christi Rushing signed off on Scholl's termination request. (*Id.*; Doc. 65-20 at ¶ 6). Also on September 8, 2011, both Christi

19

Rushing and Susan Rosborough signed the Jury Sheet for Plaintiff's termination during normal business hours. *Id.*

On September 8, 2011, Plaintiff spoke with Mike Sheely, who confirmed Plaintiff's suspicions that he was going to be terminated. (Doc. 59-12 at 305-306). Plaintiff did not submit his i-Report until he returned home from work during the evening of September 8, 2011. (*Id.* at 305:13-15, 309:5-12). Christi Rushing was not assigned Plaintiff's i-Report until 8:29 a.m. on September 9, 2011. (Doc. 60-20 at ¶ 10). Rushing declared under oath that she did not discuss the i-Report with either Cathy Brune or Ben Tarver, who were the final two individuals to sign off on Plaintiff's termination on September 9, 2011. Plaintiff fails to contravene these factual assertions, and the record does not contain any evidence that would establish a genuine issue of material fact as to veracity or the timing of the events described above.

Second, Plaintiff cannot show that Defendant retaliated against him when it did not offer him employment after it purchased eAgent. The evidence clearly indicates that Darren Robbins was responsible for deciding whom to hire when Defendant acquired the eAgent asset. (Doc. 60-49 at ¶¶ 6-7). In his declaration, Robbins stated that he "was not aware of the circumstances surrounding Plaintiff's departure from Allstate" and was not aware "that he had complained about any of Allstate's employment practices or filed a charge with the Equal Employment Opportunity Commission." (*Id.* at ¶ 5). Plaintiff has not argued that Robbins had any knowledge of his protected activities. Furthermore, the record does not contain any evidence contradicting the fact that Robbins made the decision not to re-hire Plaintiff, nor does the record contain any evidence that Robbins was, in fact, aware of Plaintiff's protected activities when he made his decision. Accordingly, Plaintiff cannot establish a *prima facie* case of retaliation because he has

failed to create a genuine dispute of material fact regarding the element of causation. Therefore,

Defendant's Motion for Summary Judgment on Count II is hereby **GRANTED**.

      **ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED**. The Clerk

of Courts is directed to enter judgment for the Defendant and against the Plaintiff and to close

this case.

      **DONE AND ORDERED** in Chambers in Tampa, Florida, this ___ day of August, 2014.


ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Copies to: All parties and counsel of record.

21